UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

UNITED STATES OF AMERICA

- against-

JIA HOU, *et al.*,

                                   Defendants.

------------------------------------------------------------ X

S1 12 Cr. 153 (RJS)

**MEMORANDUM OF LAW OF JIA (JENNY) HOU
IN SUPPORT OF HER MOTION TO SET ASIDE THE VERDICT
AND FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED R. CRIM. P. 29(c)**

May 31, 2013

GERALD B. LEFCOURT, P.C.
Gerald B. Lefcourt
Sheryl E. Reich
Renato C. Stabile
148 East 78th Street
New York, N.Y. 10075
Tel: (212) 737-0400
Fax: (212) 988-6192
 lefcourt@lefcourtlaw.com
*Attorneys for Jenny Hou*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................................................... ii

Introduction................................................................................................................1

Argument ...................................................................................................................2

POINT ONE
THE COURT SHOULD SET ASIDE MS. HOU'S CONVICTION ON COUNT TWO
AND ENTER A JUDGMENT OF ACQUITTAL ON THAT COUNT ......................2

    1.  The Legal Framework.................................................................................2

    2.  The Evidence Cited in Support of a Conviction Under Count Two .............................3

    3.  The Evidence Was Legally Insufficient To Sustain a Conviction of Attempted
       Wire Fraud As to the May 9 and August 17 Events .........................................5

    4.  The Evidence Was Legally Insufficient To Sustain a Conviction of Attempted
       Wire Fraud For the July 2011 Thomas Wang Solicitation .........................................10

    5.  The Alternative Legal Theories of Guilt Argued by the Government Requires
       the Court to Set Aside the Verdict as to Count Two......................................................14

POINT TWO

THE COURT SHOULD SET ASIDE THE CONVICTIONS ON COUNTS THREE AND
FOUR AND ENTER A JUDGMENT OF ACQUITTAL ON THOSE COUNTS ......................15

CONCLUSION.........................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Griffin v. United States,*
502 U.S. 46 (1991)..................................................................................................14

*United States v. Autuori,*
212 F.3d 105 (2d Cir. 2000)......................................................................................3

*United States v. Crowley,*
318 F.3d 401 (2d Cir. 2003)...................................................................................4, 5

*United States v. D'Amato,*
39 F.3d 1249 (2d Cir. 1994)....................................................................................13

*United States v. Desposito,*
704 F.3d 221 (2d Cir. 2013)...............................................................................4, 5, 8

*United States v. Farhane,*
634 F.3d 127 (2d Cir. 2011)......................................................................................4

*United States v. Foley,*
73 F.3d 484 (2d Cir. 1996)..................................................................................15, 21

*United States v. Glenn,*
312 F.3d 58 (2d Cir. 2002)........................................................................................3

*United States v. Manley,*
632 F.2d 978 (2d Cir. 1980)...............................................................................4, 5, 8

*United States v. Martinez,*
54 F.3d 1040 (2d Cir. 1995)......................................................................................3

*United States v. Shellef,*
507 F.3d 82 (2d Cir. 2007)..................................................................................15, 21

*United States v. Starr,*
816 F.2d 94 (2d Cir. 1987)......................................................................................13

*United States v. Szur,*
289 F.3d 200 (2d Cir. 2002)................................................................................15, 21

**STATUTES**

18 U.S.C. §1001 ......................................................................................................15

18 U.S.C. §1349 ...........................................................................................................................3

18 U.S.C. §1512(c)(2) .................................................................................................................15

**OTHER AUTHORITIES**

Fed. R. Crim. P. 29(c)(1) ............................................................................................................3

Federal Rule of Criminal Procedure 29(a) ................................................................................2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

UNITED STATES OF AMERICA

                                                           S1 12 Cr. 153 (RJS)

- against-

JIA HOU, *et al.*,

                                Defendants.

------------------------------------------------------------------- X

## MEMORANDUM OF LAW OF JIA (JENNY) HOU
## IN SUPPORT OF HER MOTION TO SET ASIDE THE VERDICT
## AND FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED R. CRIM. P. 29(c)

Introduction

      Defendant Jia (Jenny) Hou submits this Memorandum of Law in support of her motion to

set aside the jury's verdict and for judgment of acquittal pursuant to Fed. R. Crim. P. 29(c). As

detailed below, a judgment of acquittal should be entered with respect to the three counts of

conviction because the evidence as to each count fails to support a finding of guilt beyond a

reasonable doubt.

      The jury acquitted Ms. Hou of Count One, the alleged conspiracy to engage in wire fraud,

specifically through a scheme to defraud the City of New York of campaign matching funds by

Straw Donors. The jury convicted Ms. Hou of Count Two, an attempt to engage in the exact

same scheme to defraud. Counts Three and Four charged efforts to cover up the alleged crimes,

by intentionally failing to produce documents to the grand jury and by making false statements to

the government during an interview.

In light of the general verdict as to Count Two and the alternative theories of guilt argued by the government at trial, it is unclear precisely what conduct the jury relied on to reach a guilty verdict on the attempt: Ms. Hou's conduct related to the May 9, 2011 event; her conduct related to the August 17, 2011 event; or her July 2011 solicitation of a donation from her ex-boyfriend Thomas Wang. For the reasons herein, we submit that the evidence was insufficient to sustain a conviction under any of these theories.

As to Count Three, the evidence was insufficient to demonstrate that Ms. Hou acted corruptly and willfully by failing to produce certain documents required by the grand jury subpoena.

As to Count Four, it is unclear which of the two false statements alleged in the Superseding Indictment the jury unanimously agreed was the basis of the conviction – (a) that all required intermediaries were disclosed to the New York City Campaign Finance Board or (b) that she had produced all documents responsive to the grand jury subpoena by looking at every single email in her email account, or both. But the evidence was insufficient to support a conviction for either statement.

### Argument

### POINT ONE

### THE COURT SHOULD SET ASIDE MS. HOU'S CONVICTION ON COUNT TWO AND ENTER A JUDGMENT OF ACQUITTAL ON THAT COUNT

1. The Legal Framework

Federal Rule of Criminal Procedure 29(a) provides that after a jury verdict, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." *And see* Fed. R. Crim. P. 29(c)(1) (allowing for such

motions after jury verdicts). The Court reserved decision on Ms. Hou's motion made after the close of the government's case.

The relevant inquiry is '"whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (*quoting United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)).

Where a fact to be proved is also an element of the offense, however, "it is not enough that the inferences in the government's favor are permissible." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). The Court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *Id.* (*citing United States v. Soto*, 47 F.3d 546, 549 (2d Cir. 1995), and *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994)). "[I]f the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury must necessarily entertain a reasonable doubt.'" *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (*quoting United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996)). It is in this legal context that we review the evidence adduced in support of the charges.

    2. The Evidence Cited in Support of a Conviction Under Count Two

Count Two of the Superseding Indictment charged Ms. Hou with violating 18 U.S.C. §1349 by attempting to engage in the same scheme to defraud described in Count One: "a scheme to defraud the City [of New York] by using Straw Donors, and by taking steps to conceal

3

the use of Straw Donors, to attempt to obtain campaign matching funds through interstate wires to support the Candidate's campaign for Citywide elective office." (Sup. Ind. ¶¶ 4 and 8).

As the Court instructed the jury, to be guilty of this attempt, the defendant must (1) intend to commit the crime of wire fraud and (2) take a "substantial step" towards the commission of the crime, beyond "mere preparation," such as planning, devising, obtaining, or arranging a means for its commission. An attempt exists where the defendant's acts themselves "clearly indicate that the person intended to commit the crime and the acts are a substantial step in a course of conduct planned to culminate in the commission of the crime." (Jury Charge Tr. 1892:21-25; 1893:1-7).[1]

As defined by the Second Circuit, "'[a] substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime.'" *United States v. Crowley*, 318 F.3d 401, 408 (2d Cir. 2003) (*citing United States v. Manley*, 632 F.2d 978, 987 (2d Cir. 1980)). "In order for behavior to be punishable as an attempt, it need not be incompatible with innocence, yet it must be necessary to the consummation of the crime and be of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute." *Manley*, 632 F.2d at 987-988.

To satisfy the "substantial step" element, the government must show that the defendant took a substantial step toward committing the crime that was "strongly corroborative of the firmness of the defendant's criminal intent." *United States v. Desposito*, 704 F.3d 221, 231 (2d Cir. 2013) (*quoting United States v. Farhane*, 634 F.3d 127, 146-47 (2d Cir. 2011)). Equivocal

---

[1] Unless otherwise noted, all transcript references are to the trial transcript, with the witness noted where applicable.

innocent acts cannot satisfy this standard, even if they happen to further the alleged criminal scheme in some way.

"Determining whether particular conduct constitutes a substantial step is so dependent of the particular factual context of each case that, of necessity, there can be no litmus test to guide the reviewing courts." *Crowley*, 318 F.3d at 408 (*citing Manley*, 632 F.2d at 988); *see also Desposito*, 704 F.3d at 233 (*citing United States v. Delvecchio*, 816 F.2d 859, 861 ("Although the verbal formula for what constitutes a substantial step is clear, courts have not always found it easy to decide whether a defendant's conduct has crossed over the line from 'preparation' to 'attempt'")). "An act that may constitute a substantial step towards the commission of one crime may not constitute such a step with respect to a different crime." *Farhane*, 634 F.3d at 147.

As the Second Circuit observed in *Manley*, there is frequently an "imperceptible boundary from preparation into the forbidden territory of attempt," *Manley*, 632 F.2d at 988, and the issue of whether a defendant's conduct constituted a "substantial step" towards commission of a crime is "always a troublesome one for both judge and jury." *Id*. That is especially true where, as here, the defendant's acts were not "uniquely criminal and generally incompatible with innocent purpose." *Id*.

3. The Evidence Was Legally Insufficient To Sustain a Conviction of Attempted Wire Fraud As to the May 9 and August 17 Events

The evidence as to the May 9 and August 17 events was legally insufficient to support Ms. Hou's conviction of attempted wire fraud because a rational jury could not fairly conclude guilt beyond a reasonable doubt under either theory.

As to the May 9 event, a parade of witnesses, each of whom testified under a non-prosecution agreement, testified that he or she secretly reimbursed donors for donations to the

5

Liu campaign, but none of them testified that he or she told Ms. Hou about it. (*See, e.g.*, X.J. Chen Tr. 733:5-7; M.H. Wang Tr. 838:1-12; Y.L. Lu Tr. 808:10-17).

The evidence certainly showed that Ms. Hou was involved in and furthered the success of the May 9th event. What it failed to show was that she had any knowledge of any unlawful plan to obtain matching funds through donors at the event.

For example, when government witness Yi-Liang ("Alex") Lu sent Ms. Hou an email asking if non-New York State residents could donate at the May 9 fundraiser, Ms. Hou answered "Yes, people who live outside of New York State can donate as well." (GX 225). If the plan was to use straw donors to obtain matching funds, and she knew about it and sought to further it, then it is simply inconceivable that she would not encourage Mr. Lu to focus on locating donors with New York City addresses. Instead, she manifested her innocence of any scheme, telling him that there is no reason to limit donors to New York residents.

Indeed, Ms. Hou was so ignorant of the May 9 straw donor scheme that she sought to take out a newspaper advertisement thanking the individuals who helped organize the May 9 event. (GX 520). This was conduct entirely inconsistent with the government's argument that she took steps to conceal the involvement of the very individuals whom she pushed to agree to be publicly thanked for their fundraising efforts.

Similarly, for the August 17 event, there was no evidence that Ms. Hou had been informed of the secret straw donor scheme between codefendant Oliver Pan and undercover FBI Special Agent John Chiue (aka "Richard Kong") or the meaning of the supposed code "this is Richard's event." FBI Special Agent Samantha Bell testified that when she interviewed Mr. Pan on October 24, 2011, he told her that he was the one who came up with the idea to reimburse donors; that "nobody helped him; it was his idea, his plan;" and that "he told the campaign that it

6

was Richard's event to imply that all the money was Richard's money. He said he didn't know how the campaign took it, but that's what he meant by the statement." (Bell Tr. 1040:8-18).

While the recorded conversations admitted into evidence showed that Mr. Pan understated to Agent Bell the role played by "Richard Kong", the tapes entirely and unequivocally corroborated that Ms. Hou played no role in planning the event or recruiting donors or being told the source of the donations.

This is confirmed by the undercover agent's efforts to draw out from Ms. Hou her knowledge of the scheme when he questioned her at the August 17 event. For example, when FBI agent "Richard Kong" asked Ms. Hou if all of the "people on the list will be getting matching funds," Ms. Hou replied, "uhm…that I'm not sure…we have to take it back to our office to sorta re…just to…by looking at the names…I…I have no way of telling." (GX 107-T, p.18).

Her post-event conduct was also unequivocally consistent with, and demonstrative of, her innocence and lack of knowledge: when the $800 check of August 17 donor Sing Pun bounced, Ms. Hou contacted Mr. Pan to get a new check. She did not say "hey, this person who was reimbursed $800 is making off with the money because his check bounced." Ms. Hou even pursued the Sing Pun donation *after* the *New York Times* article was published on October 11, 2011 accusing the Liu campaign of accepting straw donations, evidencing Ms. Hou's complete lack of knowledge of the August 17 straw donor scheme. (GX 292).

So, not only was there no evidence that Ms. Hou had knowledge of the straw donor schemes on May 9 and August 17, but the evidence that was admitted demonstrated her utter lack of knowledge.

Not surprisingly, in light of these evidentiary deficiencies, the jury acquitted Ms. Hou of the conspiracy charge. The evidence of Ms. Hou's knowledge and awareness of what was going on around her was so lacking that no rational juror could have concluded that Ms. Hou intended to commit the crime of wire fraud with respect to the May 9 or August 17 events. In addition, however, Ms. Hou could not properly be convicted of the attempt charge because her acts related to the May 9 and August 17 events did not constitute a "substantial step" in furtherance of the alleged scheme to defraud.

While there was some evidence that Ms. Hou participated in acts that could be considered "preparatory" to the scheme to defraud described in the Superseding Indictment, none of it was shown to be known by her to be part of a scheme or that she intended the conduct to further a scheme. Instead, her conduct fell short of being a "substantial step" in furtherance of the alleged scheme to obtain matching funds from the City of New York and was not "of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute" nor "strongly corroborative of the firmness of the defendant's criminal intent." *See Manley*; *Desposito*.

At best, the evidence at trial demonstrated that Ms. Hou's conduct was entirely consistent with her normal legal duties as treasurer of the Liu campaign.

For example, with respect to the May 9 event, there was evidence that Ms. Hou exchanged emails with Alex Lu to help schedule the May 9 event (*e.g.*, GX 216-225); Ms. Hou received guest lists from Lu (*e.g.*, GX 227-232); Ms. Hou attended the May 9 event and received 12-15 unspecified donor forms from Lu at the event (Lu Tr. 755:2-6); and Ms. Hou followed-up on missing information from the donor forms (*e.g.*, GX 233-239). Each of these activities is entirely consistent with the responsibilities of a campaign treasurer, including, as Dan Cho, the

Director of Candidate Services for the New York City Campaign Finance Board (NYCCFB),

testified, recovering information left off donor forms. (Cho Tr. 1353:4-21).

For the August 17 event, there was no evidence that Ms. Hou had any role in planning the

fundraising event; indeed, the evidence showed she was in China between August 1, 2011 and

August 10, 2011 (Tr. 1604:20-23). The evidence also showed that Ms. Hou was not even

expected to attend the August 17 event (Chiue Tr. 447:15-16) and had never met Richard Kong

(Chiue Tr. 449:18-24). She appeared at the August 17 event and performed mundane tasks

related to her role as treasurer, such as collecting and reviewing donor forms; making name tags;

and taking photos. (GX 107-T). Beyond that, Ms. Hou followed-up on a bounced check with Mr.

Pan. (GX 292).

There was also no evidence that Ms. Hou entered any of the May 9 or August 17 donor

information into C-Smart as a preparatory step later to try to obtain matching funds. Instead,

Sharon Lee testified that it was she who did the data entry into C-Smart under the supervision of

Ms. Hou (Lee Tr. 894:13-21), and that she could not recall any specific conversation with Ms.

Hou regarding matching funds (Lee Tr. 897:22-25 – 898:1-15). The government adduced no

evidence as to who, if anyone, made the determination to enter the May 9 straw donations as

"matchable" in the C-Smart system.

Ms. Hou's activities of confirming the date and time of the fundraising events, obtaining

guest lists, attending the fundraising events, making name tags, collecting and reviewing forms,

taking pictures, and following-up on missing information donor forms and a bounced check are

all activities that are compatible with an innocent purpose and Ms. Hou's duties as treasurer of

the Liu campaign. Without evidence that Ms. Hou knew of the fraudulent nature of the

donations, there was simply no basis for the jury to conclude that her otherwise lawful acts were

9

in furtherance of an attempt to commit wire fraud, as opposed to wholly innocent acts required by her job. There was certainly nothing about Ms. Hou's conduct to "clearly indicate that [she] intended to commit the crime [of wire fraud]." (Jury Charge Tr. 1893:4-5).

The campaign was also still several steps removed from obtaining matching funds from the City of New York. As Dan Cho testified, in order to obtain matching funds, the campaign would first have to choose to certify that it sought to participate in the program, and that as of the date of Mr. Cho's testimony (April 29, 2013), the campaign had not done so, nor could it have done so, since the matching funds certification form was not yet available. (Cho Tr. 1344:20-25 – 1345:1-6). Mr. Cho testified as well to other requirements that had to be met before a campaign could receive matching funds (Cho Tr. 1435:7-25 – 1347:3; GX 1302-A-037-038). As Mr. Cho acknowledged, the Campaign had "a lot of ways to go in terms of requirements in order to actually get matching funds." (Cho Tr. 1348:3-11).

Therefore, even if Ms. Hou's performance of her ordinary duties as treasurer were sufficient for a jury to "conclude beyond a reasonable doubt that [they were] undertaken in accordance with a design to violate the statute" (which we submit they were not), in any event they did not constitute a "substantial step" toward the commission of the alleged scheme to defraud sufficient to sustain the conviction.

4. The Evidence Was Legally Insufficient To Sustain a Conviction of
Attempted Wire Fraud For the July 2011 Thomas Wang Solicitation

By motion dated January 7, 2013 [Dkt. No. 91], Ms. Hou moved in limine to exclude evidence of her solicitation of a donation from her ex-boyfriend, Thomas Wang, and her offer to reimburse Wang for the donation. The basis for the motion was that the evidence was irrelevant because Ms. Hou's offer to reimburse Wang for a donation could not be in furtherance of the scheme to defraud the City of New York that was alleged in the Superseding Indictment because

10

Wang was a New Jersey resident and his donation could therefore not have qualified for matching funds. In the alternative, Ms. Hou moved for exclusion of the evidence because it was unfairly prejudicial.

The government opposed the motion and argued that the Wang evidence was relevant to proving the scheme to defraud alleged in Counts One and Two of the Superseding Indictment and as 404(b) evidence. *See* 1/14/13 Gov't Memo [Dkt. No. 97], p.13 ("this evidence of Hou's solicitation of a Straw Donor, could, on its own, support an attempted wire fraud charge").

At oral argument on January 29, 2013, the Court denied Ms. Hou's motion to exclude evidence of the Wang solicitation, concluding that the evidence was relevant to counts one and two. (1/29/13 Tr. 4:21-25).

At trial, Mr. Wang confirmed the solicitation of a donation and an offer of reimbursement. He also confirmed that he was not a New York City resident. (Wang Tr. 527:19-25). And he testified that the donation was never made; however, if it were made, he would never have sought the reimbursement. (Wang Tr. 531:7-11).

During the portion of the government's summation on Count Two, the government argued – consistent with its position in opposition to Ms. Hou's motion in limine – that the jury could find that a scheme to defraud existed based on Ms. Hou's offer to reimburse Mr. Wang. (AUSA Anderson: "Third, how do you know the defendants participated in a scheme to defraud? (Tr. 1687:22-23).... "You also learned about Ms. Hou's own efforts to reimburse a straw donor, her friend Thomas Wang. She called him up, and she offered to reimburse him." (Tr. 1688:9-11)).

But the evidence was insufficient for a reasonable jury to conclude beyond a reasonable doubt that Ms. Hou intended to defraud the City of New York by attempting to obtain matching

11

funds based on the Wang solicitation and Ms. Hou could not be convicted of attempted wire fraud for this conduct, as a matter of law.

As the Court instructed the jury, to find Ms. Hou guilty of attempted wire fraud, the jury had to conclude, *inter alia*, that Ms. Hou acted with "specific intent to defraud" (Jury Charge Tr. 1893:23), which the Court defined as "to act willfully and with the specific intent to deceive for the purpose of causing some financial loss to another – here, to deprive the City of New York's matching-funds program of money. However, the government need not prove that the intended victim was actually harmed, only that such harm was intended." (Jury Charge Tr. 1898:21-25 – 1899:1). In other words, some economic harm or monetary loss to the City of New York *must* have been contemplated by Ms. Hou when she solicited a donation from Wang and offered to reimburse him. Not only was the evidence legally insufficient to demonstrate that Ms. Hou acted with the requisite intent to defraud, but the legal theory on which it was based could never have sustained a conviction on Count Two.

One fact at trial as to which all parties were in complete agreement was that in order to qualify for matching funds from the City of New York, the donor had to be a New York City resident. Because Thomas Wang was not a New York City resident, his donation to the Liu Campaign, reimbursed or not, could not have qualified for matching funds under NYCCFB rules. (GX 1302-A-036, NYCCFB PowerPoint).

There was substantial evidence at trial that Ms. Hou received training and should have been familiar with this basic rule. (Schafenberg Tr. 126:5-16). Thus, Ms. Hou could not have intended to use the Wang donation to obtain matching funds. As such, Ms. Hou could not have acted with specific intent to defraud as to Count Two because she could not have intended to

12

cause financial loss to the City of New York for the Wang donation. Nor could Ms. Hou have

caused financial loss to the City of New York, as a matter of law.

As the Second Circuit reiterated in *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir.

1994), it has long recognized that

> [e]ssential to a scheme to defraud is fraudulent intent. *Durland v.
> United States*, 161 U.S. 306, 313-14 (1896) ("The significant fact is
> the intent and purpose"); *United States v. Starr*, 816 F.2d 94, 98 (2d
> Cir. 1987) (fraudulent intent "critical" to a scheme to defraud);
> *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d
> Cir. 1970) (same). The government must show "that some actual
> harm or injury was contemplated by the schemer." *Regent Office
> Supply Co.*, 421 F.2d at 1180; *see also United States v. Mittelstaedt*,
> 31 F.3d 1208 (2d Cir. 1994); *Starr*, 816 F.2d at 98; *United States v.
> London*, 753 F.2d 202, 206 (2d Cir. 1985).

Because the defendant must intend to harm the fraud's victims, "misrepresentations amounting

only to a deceit are insufficient to maintain a mail or wire fraud prosecution." *Starr*, 816 F.2d at

98. Instead, "the deceit must be coupled with a contemplated harm to the victim." *Id.* Simply

put, not all lies made over interstate wires are federal crimes, unless there is some contemplated

harm to the intended victim.

Even assuming that (a) Ms. Hou had moved forward with the plan to reimburse Wang for

his donation and (b) that Wang had falsely signed a donor form stating that the funds were his

own and that he had not been reimbursed, that conduct would still not rise to the level of wire

fraud because there is no contemplated harm to the alleged victim – the City of New York.

Merely lying about the source of the funds by falsely signing the affirmation on the donor form

would not have been sufficient to cause any financial loss or economic harm to the charged

scheme's intended victim – the City of New York.[2]

Besides not acting with the requisite specific intent to defraud, Ms. Hou did not take a "substantial step" towards reimbursing Wang for his donation. The evidence demonstrated that Ms. Hou asked Wang to make a donation, obtained his credit card information from him, sent him a donor form, and offered to reimburse him. She then told him the donation was not needed. These preparatory acts fall far short of the "substantial step" required to sustain the jury's guilty verdict on Count Two and were certainly not of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the wire fraud statute.

5. The Alternative Legal Theories of Guilt Argued by the
Government Requires the Court to Set Aside the Verdict as to Count Two

Since a conviction on Count Two based on the Wang solicitation would be invalid as a matter of law, the Court should not even consider whether or not the evidence was "sufficient" to sustain a conviction under that erroneous theory. There exists no quantum of evidence under which any defendant could be convicted of wire fraud for the conduct alleged here – reimbursing an out-of-state donor for a campaign contribution to a New York City candidate, where, as here, the defendant has both knowledge of the material facts (*i.e.*, that the donor lives out of state) and the law (*i.e.*, that out-of-state residents do not qualify for matching funds).

The Supreme Court has recognized that where the jury is presented with multiple theories of guilt, one of which fails to come within the statutory definition of the crime, and returns a general verdict, the verdict must be set aside. *Griffin v. United States*, 502 U.S. 46, 52 (1991)

---

[2] Recognizing this deficiency, the government speculated that perhaps the campaign would have simply lied about Wang's residence. (AUSA Jacobs Rebuttal Summation Tr. 1845:7-9). Of course, there was no evidence to suggest that this was Ms. Hou's plan. Indeed, upon learning that Mr. Wang's parents maintained a residence in Queens she never suggested that the address would come in handy at a later date. (GX 303).

(*quoting United States v. Yates*, 354 U.S. 298, 312 (1957) ("we think the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected") (internal citations omitted); *United States v. Foley*, 73 F.3d 484, 493 (2d Cir. 1996) (*citing Griffin* and *Yates*); *United States v. Szur*, 289 F.3d 200, 208 (2d Cir. 2002); *United States v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007) ("Where a jury is presented with multiple theories of conviction, one of which is invalid, the jury's verdict must be overturned if it is impossible to tell which theory formed the basis for conviction") (*quoting Szur*). For these reasons, the conviction on Count Two must be set side.

**POINT TWO**

**THE COURT SHOULD SET ASIDE THE CONVICTIONS
ON COUNTS THREE AND FOUR AND ENTER A JUDGMENT
OF ACQUITTAL ON THOSE COUNTS**

Ms. Hou was also convicted of two counts relating to her alleged efforts to hide the evidence of her participation in the unlawful scheme. Because she was acquitted of the conspiracy, and as detailed above, the conviction on the attempt cannot stand because of insufficient evidence, the evidence is likewise insufficient to show Ms. Hou had any intent to hide the information.

Under Count Three of the Superseding Indictment, Ms. Hou was convicted of obstruction of justice under 18 U.S.C. §1512(c)(2). The charge was based on Ms. Hou's failure to produce her emails responsive to a grand jury subpoena served on the Liu Campaign.[3]

---

[3] There is no way of knowing which documents the jury relied on in reaching its guilty verdict – whether some jurors believed that Ms. Hou willfully failed to produce some documents (such as the Thomas Wang G-chats), while other jurors believed she willfully failed to produce different documents (such as the Jorge Fanjul G-chat).

Under Count Four, Ms. Hou was charged with making false statements during her government interview on February 27, 2012, under 18 U.S.C. §1001. Those statements were (a) that the list of intermediaries publicly disclosed by the Candidate's campaign on or about January 17, 2012, contained the names of all intermediaries that Ms. Hou knew about and no one was left off, and that (b) in response to Grand Jury subpoenas, Ms. Hou had produced all responsive documents, after, among other things, looking at every single email in her email account.

There is no question that there are emails Ms. Hou failed to produce. The principal question facing the jury was whether she did so out of lack of direction, sloppiness, lack of time, or all three,[4] or with the requisite intent.

Of course, Ms. Hou's failure to produce her emails and G-Chats could not have actually impeded the government's investigation because by the time Ms. Hou produced or failed to produce documents, the government had already obtained all of her emails and G-Chats directly from Google via a search warrant. (Chu Tr. 865:1 – 866:6).

In fact, Paul Shechtman, John Liu's attorney, testified that he assisted in responding to the grand jury subpoenas served on the Liu Campaign and Ms. Hou was given responsibility for locating responsive documents on behalf of the campaign. (Shechtman Tr. 557:10 – 558:19). Mr. Shechtman also testified that he told Ms. Hou that he believed that the government had or would the documents from other sources and therefore the exercise was not about providing the government with documents so much as playing out a game of "gotcha". (Shechtman Tr. 560:12

---

[4] Substantial evidence was submitted, principally through the testimony of attorneys Paul Shechtman and Martin Connor, as well as through that of paralegal Adam Murphy, as to the circumstances of the search for responsive documents.

– 561:4). A similar admonition was given to her by Martin Connor, counsel to the campaign. (Connor Tr. 635:2-6).

In light of these attorneys' instructions to Ms. Hou, there would be no rational basis for her to attempt to conceal documents from the grand jury and lie about it. In fact, the government had already obtained those documents, so any false statement to the FBI about whether or not Ms. Hou had produced all responsive documents could not have been material, since it could not have influenced the government's decisions or activities. (Jury Charge Tr. 1910:20-25).

The evidence at trial demonstrated that Ms. Hou's production of emails was often haphazard, in that she failed to produce some "incriminating" emails that were nearly identical to other emails that she did produce. (*See, e.g.*, Lefcourt Summation Tr. 1822:14 – 1828:15, comparing what was produced to what was not produced; GX 1602, Gov't Summary Chart).

The government obviously recognized the haphazard nature of Ms. Hou's document production: in its summation it highlighted the G-chats that were the subject of Ms. Hou's motions in limine – the Thomas Wang G-chats (GX 277-278; 301-303) and the Jorge Fanjul G-chat (GX 711), which the government was permitted to argue were in furtherance of the charged scheme to defraud. Because the government was permitted to make these arguments, the significance of these non-produced documents was magnified.

The evidence at trial, however, demonstrated that this evidence was not in furtherance of the scheme to defraud charged in the Superseding Indictment.

For example, Thomas Wang testified that he and Ms. Hou had a longstanding relationship and had been exploring re-kindling their romance in Spring 2011, just before the G-Chat communications. In that time, Mr. Wang offered to buy things for Ms. Hou's younger brother, such as video games (DX TW-6), and purchased an expensive handbag for Ms. Hou

17

during a trip to New York to visit her. During a series of G-Chats, Wang refused reimbursement for the handbag and insisted that Ms Hou keep it as a gift. (*see, e.g.*, DX TW-16, TW-20, TW-27-29). Wang testified that he never accepted reimbursement for the handbag. (Wang Tr. 519:22-25 – 520:1-5), a fact corroborated by the admission into evidence of multiple G-chats between them in which he repeatedly declined Ms. Hou's repeated offers to return the bag or reimburse him for it.

Wang also testified that he would have donated to the Liu Campaign simply because Ms. Hou had asked him to do so, because she was a lifelong friend, and that she did not need to offer Wang anything in return to get him to donate. (Wang Tr. 527:11-18). He also testified that he never would have demanded a reimbursement check from her if she never sent it. (Wang Tr. 531:7-11).

For all the reasons discussed in Ms. Hou's motion in limine, and in light of the additional evidence that was presented at trial, we submit that it is even more clear now that Ms. Hou's solicitation of a donation from Wang and offer to reimburse him was not in furtherance of the alleged scheme to obtain matching funds from the City of New York. But even if that were true, the probative value of the evidence was outweighed by unfair prejudice to Ms. Hou and the evidence should not have been admitted as proof of the scheme to defraud.

Despite this evidence and for all the other reasons discussed above why Ms. Hou's solicitation of Wang could not have been part of a scheme to defraud because there was no possibility that she intended to cause economic harm to the City of New York, the government argued that Ms. Hou's failure to produce the Wang G-chats in response to the grand jury subpoena was intentional because they were incriminating. (AUSA Anderson Summation Tr. 1694:4-15).

18

In the Fanjul G-chat (GX 711), Ms. Hou stated "fyi, CFB auditors look very carefully at the handwriting…so if you're doing that, just make sure the handwriting looks as close to the donors' as possible if too difficult don't take risk."

Called by the defense at trial, [5] Mr. Fanjul testified that at around the same time as the G-chat, he had been tasked with recovering information for donor forms from a fundraising event he had organized, known as the "Koteen Event." (Fanjul Tr. 1391:15-17). Fanjul testified that on some of the forms he wrote the word "same" next to business address on some forms (*see, e.g.,* Fanjul Tr. 1403:19-24), and on some forms he wrote the word "self" for the employment information (*see, e.g.,* Fanjul Tr. 1405:1-10). Mr. Fanjul testified that he never made any attempt to imitate the handwriting of any donor. (Fanjul Tr. 1406:2-6).

As to the G-chat, Mr. Fanjul testified that it was pursuant to an effort to avoid creating unnecessary extra work for the campaign if the NYCCFB questioned why there was different handwriting on a donation form, even though there was nothing improper about filling in missing information. As Mr. Fanjul testified, "when you are doing lots of these forms, there's always a chance that, you know, one might get rejected. Then you have to go through the paperwork of having to do it again for a technicality, like two different colors of ink or there are handwritings on things that you can be writing and there's nothing illegal with respect to the forms. So I assume that's what she was talking about, but I can only assume." (Fanjul Tr. 1418:13-20).

There was no allegation made at trial that any donations from the Koteen event were from straw donors. Trying to match the donor's handwriting while filling in missing information such as "self" or "same" on the Koteen donor forms was certainly not in furtherance of the straw donor scheme the government attempted to prove at trial. As Fanjul testified, to the extent he was

---

[5] The government made a strategic decision not to call Fanjul as a witness, hoping to imbue the G-chat with its own interpretation.

19

instructed to match donor handwriting, the purpose would have been to avoid having to needlessly redo paperwork if questions were raised by NYCCFB, even though there was absolutely nothing illegal about campaign staff filling in missing information on a donor form, even according to both Dan Cho (Cho Tr. 1286:14-21; 1322:2-5) and former NYCCFB Candidate Services Liaison Adam Schafenberg (Schafenberg Tr. 119:3-20).

Now that the Fanjul G-chat (GX 711) is placed in the proper context at trial and in light of Fanjul's testimony about the circumstances surrounding it, we submit that the relevance of this evidence, if any, is far outweighed by the unfair prejudice to Ms. Hou and that the evidence should not have been admitted as evidence of the scheme to defraud.

Nevertheless, like the Wang G-chats, the government was able to argue that Ms. Hou's failure to produce the Fanjul G-chat was intentional because it was also incriminating. (AUSA Anderson Summation Tr. 1695:1-5). While the Thomas Wang and Jorge Fanjul G-chats might have been admitted anyway for Counts Three and Four because they were responsive to the grand jury subpoena, the significance of Ms. Hou's failure to produce them was heightened exponentially by the government arguing that these G-chats were in furtherance of the scheme to defraud and provided Ms. Hou with a strong motive to "corruptly" try to hide them from the government. (AUSA Anderson Summation Tr. 1641:1 – 1643:24).

Where the defense to Ms. Hou's failure to produce certain subpoenaed documents was that it was oversight with no wrongful intent, permitting the government to argue that the omitted emails were in furtherance of the alleged scheme to defraud placed much greater significance on Ms. Hou's failure to produce those documents and statement to the government about her email search.

20

But for the reasons discussed herein, the Wang and Fanjul G-chats were not in furtherance of the scheme to defraud, and the government should not have been permitted to argue that Ms. Hou corruptly withheld them based on their supposedly incriminating nature.

Finally, no rational jury could have convicted Ms. Hou of Count Four based on her statement that that the list of intermediaries publicly disclosed by the Candidate's campaign on or about January 17, 2012, contained the names of all intermediaries that Hou knew about and no one was left off. That is so since Ms. Hou's statement was *true* – all individuals who satisfied the legal definition of an intermediary were disclosed on or about January 17, 2012 and have not been questioned by NYCCFB following a Statement Review (Connor Tr. 632:3 – 633:2). Moreover, even if not legally correct, in light of the extensive evidence concerning the advice provided to Ms. Hou by Mr. Connor as to who was and who was not an intermediary (DX I-9, I-25, I-26, I-44),[6] no rational jury could conclude that Ms. Hou's statement regarding intermediaries was said in knowing and willful disregard of what she knew to be the opposite. (Jury Charge Tr. 1911:16-22; 1912:12-16).

Since the jury could not have convicted Ms. Hou on this theory, and since the jury returned a general verdict on Count Four (making it impossible to tell the theory on which the conviction was based), Ms. Hou's conviction on Count Four must be set aside. *United States v. Foley, supra,* 73 F.3d 484 at 493; *United States v. Szur, supra,* 289 F.3d 200 at 208; *United States v. Shellef, supra*, 507 F.3d at 107 (". . .where a jury is presented with multiple theories of conviction, one of which is invalid, the jury's verdict must be overturned if it is impossible to tell which theory formed the basis for conviction") (*quoting Szur*).

---

[6] Including multiple memoranda setting out the facts and conclusions.

## Conclusion

For all of these reasons, the Court should enter a judgment of acquittal on Counts Two,

Three and Four.

May 31, 2013

Respectfully submitted,

GERALD B. LEFCOURT, P.C.

By: _____/s/_____

Gerald B. Lefcourt
Sheryl E. Reich
Renato C. Stabile

*Attorneys for Defendant Jenny Hou*

22