UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA

    - v -

XING WU PAN,
  a/k/a "Oliver Pan," and                    S1 12 Cr. 153 (RJS)
JIA HOU,
  a/k/a "Jenny Hou,"

             Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO THE DEFENDANTS' MOTIONS TO SET ASIDE THE VERDICT AND
FOR A JUDGMENT OF ACQUITTAL**


PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


BRIAN A. JACOBS
JUSTIN ANDERSON
Assistant United States Attorneys
    *Of Counsel*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT.................................................................................................1

ARGUMENT ....................................................................................................................................1

    A.  Applicable Law ...............................................................................................................1

      1.  Sufficiency of the Evidence ......................................................................................1

      2.  Entrapment ...............................................................................................................3

      3.  Attempt .....................................................................................................................4

    B.  Discussion .......................................................................................................................5

      1.  The Evidence Supported the Jury's Guilty Verdict as to Pan ...................................5

      2.  The Evidence Supported the Jury's Guilty Verdict as to Hou .........................14

CONCLUSION ...............................................................................................................................27

**PRELIMINARY STATEMENT**

On May 2, 2013, following a trial that began on April 15, 2013, a jury sitting in the Southern District of New York returned a verdict of guilty against Xing Wu Pan, a/k/a "Oliver Pan," convicting him of conspiring to commit wire fraud, in violation of Title 18, United States Code, Section 1349, and of attempting to commit wire fraud, in violation of Title 18, United States Code, Section 1343.  The jury also returned a verdict of guilty against Jia Hou, a/k/a "Jenny Hou," convicting her of attempting to commit wire fraud, in violation of Title 18, United States Code, Section 1343, of obstructing justice, in violation of Title 18, United States Code, Section 1512, and of making false statements to federal agents, in violation of Title 18, United States Code, Section 1001. Pan and Hou moved for judgments of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. In support of those motions, Pan filed a letter brief dated May 14, 2013 ("Pan Br."), and Hou filed a brief dated May 31, 2013 ("Hou Br."). In those submissions, both defendants claim that the evidence was insufficient to support their convictions. The Government respectfully submits this combined brief in response to those motions.[1] For the reasons set forth below, those arguments have no merit and should be denied.

**ARGUMENT**

**There Was Sufficient Evidence of Pan's And Hou's Guilt**

**A.    Applicable Law**

**1.    Sufficiency of the Evidence**

The governing legal standards for assessing the sufficiency of evidence adduced at trial are well-established.  "A defendant challenging the sufficiency of the evidence bears a very heavy burden," *United States* v. *Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011); *accord United States* v. *Temple*, 447 F.3d 130, 137 (2d Cir. 2006); *United States* v. *Desena*, 287 F.3d 170, 177 (2d Cir. 2002), and faces "an uphill battle." *United States* v. *Jones*, 30 F.3d 276, 281 (2d Cir. 1994); *see*

---

[1] The Government respectfully requests permission to file this single brief of 27 pages, where Pan's letter brief was seven pages, single spaced, and where Hou's brief was 22 pages, double spaced.

*also, e.g.*, *United States* v. *Autuori*, 212 F.3d 105, 114 (2d Cir. 2000). In considering the

sufficiency of the evidence supporting a guilty verdict, the evidence must be viewed in the light

most favorable to the Government. *See United States* v. *Temple*, 447 F.3d 130, 136-37 (2d Cir.

2006). The Court must analyze the pieces of evidence "'in conjunction, not in isolation,'" *United*

*States* v. *Persico*, 645 F.3d 85, 104 (2d Cir. 2011) (quoting *United States* v. *Eppolito*, 543 F.3d

25, 45 (2d Cir. 2008)), and must apply the sufficiency test "to the totality of the government's

case and not to each element, as each fact may gain color from others," *United States* v.

*Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999); *accord United States* v. *Persico*, 645 F.3d at 104.

The Court must also "credit[ ] every inference that the jury might have drawn in favor of the

government," *United States* v. *Temple*, 447 F.3d at 136-37 (internal quotation and citation

omitted), because "the task of choosing among competing, permissible inferences is for the

[jury], not for the reviewing court," *United States* v. *McDermott*, 245 F.3d 133, 137 (2d Cir.

2001). "These standards apply whether the evidence being reviewed is direct or circumstantial."

*Persico*, 645 F.3d at 105.

Under this standard, a jury verdict must be upheld if "*any* rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt." *Persico*, 645 F.3d at 105

(internal quotation marks and citation omitted) (emphasis in original). Indeed, the Court must

"resolve all issues of credibility in favor of the jury's verdict," *United States* v. *Desena*, 287 F.3d

at 177 (internal quotations omitted); *accord United States* v. *Abelis*, 146 F.3d 73, 80 (2d Cir.

1998), and in a close case, where "either of the two results, a reasonable doubt or no reasonable

doubt, is fairly possible, the court must let the jury decide the matter." *United States* v. *Autuori*,

212 F.3d at 114 (internal quotation marks and brackets omitted). Accordingly, a "court may enter

a judgment of acquittal only if the evidence that the defendant committed the crime alleged is

nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States* v. *Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (internal quotation marks and citation omitted).

With respect to a conspiracy verdict, such as was returned here as to Pan, the deference accorded a jury's verdict is "especially important" because "a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States* v. *Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (quoting *United States* v. *Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1991) (internal quotation marks and citations omitted)). As with the other elements of a conspiracy, "a defendant's knowledge of the conspiracy and his participation in it with criminal intent may be established through circumstantial evidence." *United States* v. *Gordon*, 987 F.2d 902, 906-07 (2d Cir. 1993).

### 2.    Entrapment

The entrapment defense has two elements: "(1) government inducement of the crime, and (2) lack of predisposition on the defendant's part." *United States* v. *Bala*, 236 F.3d 87, 94 (2d Cir. 2000) (internal quotation marks omitted). A defendant arguing entrapment bears the burden of producing "credible evidence of government inducement." *Id.*

If a defendant meets his burden of showing the Government induced him to commit the offense, the Government "must show predisposition beyond a reasonable doubt." *United States* v. *Bala*, 236 F.3d at 94. "In reviewing a challenge to the sufficiency of the government's evidence of predisposition," this Court applies "the same rigorous standard applicable to other sufficiency claims." *United States* v. *Jackson*, 345 F.3d 59, 66 (2d Cir. 2003). A defendant is predisposed to commit a crime if he is "ready and willing without persuasion to commit the

crime charged and awaiting any propitious opportunity." *United States* v. *Salerno*, 66 F.3d 544, 547 (2d Cir. 1995) (internal quotation marks omitted).

The predisposition inquiry "focuses on the state of mind of the defendant." *United States* v. *Williams*, 705 F.2d 603, 619 (2d. Cir. 1983); *accord United States* v. *Ulloa*, 882 F.2d 41, 44 (2d. Cir. 1989). Critically, predisposition does not "require specific prior contemplation of criminal conduct" by the defendant. *United States* v. *Williams*, 705 F.2d at 618. Instead, a defendant "is predisposed to commit a crime if he is ready and willing without persuasion to commit the crime charged and awaiting any propitious opportunity to do so." *United States* v. *Al-Moayad*, 545 F.3d 139, 154 (2d Cir. 2008) (internal quotation marks omitted). More specifically, the Government may prove predisposition in any of three ways: by showing "(1) an existing course of criminal conduct similar to the crime for which [the defendant] is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement." *Id.* (internal quotation marks omitted).

### 3.     Attempt

"In order to establish that a defendant is guilty of an attempt to commit a crime, the government must prove that the defendant had the intent to commit the crime and engaged in conduct amounting to a substantial step towards the commission of the crime." *United States* v. *Yousef*, 327 F.3d 56, 134 (2d Cir. 2003) (internal quotation marks and citation omitted); *see United States* v. *Manley*, 632 F.2d 978, 987 (2d Cir. 1980). "Determining whether particular conduct constitutes a substantial step is 'so dependent on the particular factual context of each case that, of necessity, there can be no litmus test to guide the reviewing courts.'" *United States* v. *Crowley*, 318 F.3d 401, 408 (2d Cir. 2003). "For a defendant to have taken a 'substantial step,'

he must have engaged in more than mere preparation, but may have stopped short of 'the last act necessary' for the actual commission of the substantive crime. A defendant may be convicted of attempt even where significant steps necessary to carry out the substantive crime are not completed, so that dangerous persons [may be apprehended] at an earlier stage . . . without immunizing them from attempt liability." *United States* v. *Yousef*, 327 F.3d at 134 (citations omitted, alterations in original). So long as a defendant engages in more than "mere preparation," and "'do[es] some overt act adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of the particular crime,'" *United States* v. *Manley*, 632 F.2d at 988 (quoting *United States* v. *Monholland*, 607 F.2d 1311, 1318 (10th Cir. 1979)), the substantial step element is met.

**B.    Discussion**

      **1.    The Evidence Supported the Jury's Guilty Verdicts as to Pan**

            **a.    The Evidence Established Pan's Intent to Defraud**

Pan challenges his wire fraud and conspiracy convictions by questioning the adequacy of the evidence establishing his intent to defraud. (Pan Br. 2-5). Under Pan's crabbed reading of the record, the trial evidence established nothing more than his "mere knowledge" that using straw donors might defraud New York City of matching funds, and it therefore failed to establish that he acted with the requisite intent. (Pan Br. 3). Pan is wrong on the law and the facts.

As to the law, Pan is correct that the Government must establish his intent to defraud, but his characterization of that burden as particularly onerous is misguided. (Pan Br. 2-3). Under Second Circuit precedent, the Government can carry its burden by showing that "the necessary result of [a] scheme is to injure others" because, in such cases, "fraudulent intent may be inferred from the scheme itself." *United States* v. *Guadagna*, 183 F.3d at 130 (brackets omitted).

Similarly, "a pattern of conduct or coordinated activities" permits a rational juror to "infer beyond a reasonable doubt that a defendant joined the scheme or unlawful enterprise with knowledge of its unlawful objective, *i.e.*, to defraud others." *United States* v. *Panza*, 750 F.2d 1141, 1149 (2d Cir. 1984). Accordingly, Pan is wrong to suggest that the intent element in a fraud case is particularly burdensome or that it cannot be established through reliance on commonsense inferences.

Here, the facts established that Pan participated in "coordinated activities" with straw donors, campaign staffers, and others to funnel illegal contributions to the Liu Campaign, *Panza*, 750 F.2d at 1149, and he did so knowing that a "necessary result of the scheme" was that the City would be deceived into awarding matching funds for those contributions, *Guadagna*, 183 F.3d at 130. Among other things, the jury learned that Pan introduced the undercover agent (the "Undercover") to Mei Hua Ru, the Liu Campaign's former treasurer, so that Ru could provide an overview of the Liu Campaign's fundraising strategy, including its reliance on matching funds. (GX 102-T). At that meeting, Pan specifically asked Ru to explain the importance of matching funds to the Campaign. In response, Ru explained that "New York City" would provide them with "a certain amount" in "matching funds." (GX 102-T at 2). While qualifying for matching funds was "a pain in the neck," it was worth it to the Campaign because an opponent in a previous election had raised less money in total during that race, but had outraised the Campaign on contributions eligible for matching funds. (GX 102-T at 2). As a result, even though the Liu Campaign, "all the way through the primaries, [had] raised more money than [the competitor], [the competitor] . . . qualif[ied] for more matching funds than [than the Liu Campaign] …. So he had an edge right away." (GX 102-T at 2-3). Ru made clear that the Campaign intended to prevent history from repeating itself by pulling out all the stops in its effort to capture as much

matching funds as possible. She even assured Pan and the Undercover that the Campaign had

"somebody else" to head up the effort to get matching funds. (GX 102-T at 4).

      After the meeting with Ru, Pan and the Undercover devised a plan to use straw donors to

funnel an impermissibly large contribution to the Liu Campaign and cause the City to provide

the Campaign with matching funds it was not truly entitled to receive. In the course of

formulating their plans, Pan repeatedly acknowledged the importance of matching funds as part

and parcel of the straw donor scheme. For example, during an August 15, 2011 telephone

conversation, Pan told the Undercover: "Oh match… match fund… matching funds is on city

side, whatever they can raise. The John Liu side, let's say they can uh… raise a million….

…uh… the… the city or the state will match whatever the uh… the percentage uh… to that."

(GX 105-T at 6). When the Undercover asked, "So whatever he raises, the city basically uh…

gives him a percentage," Pan responded, "Uh-huh." (GX 105-T at 6).

      The next day, Pan made clear that obtaining matching funds was an objective of the

scheme. At a meeting with the Undercover, Pan said, "The City, the federal, they never made

match a hundred percent. They match it fifty percent. Let's say he comes up a million. You can

get matching funds half millions. Or another million. But detail what percent I don't know." (GX

106-T at 5). While Pan might not have known all the details of how money was awarded under

the City's matching funds program, Pan certainly knew that part of the plan was to claim

matching funds for the straw donations.[2] Indeed, Pan confirmed that fact for the Undercover.

During that meeting, the Undercover asked Pan, "these contributions would they get… matching

contributions… He will?" Pan responded, "He will." (GX 106-T at 5). From Pan's conversations

---

[2] The depth of Pan's knowledge of the inner workings of the matching funds program does not bear on whether the evidence of his guilt was sufficient. *See, e.g.*, *United States* v. *Hawkins*, 547 F.3d 66, 71 (2d Cir. 2008) (noting that the "government need not prove that the defendant knew the details of the conspiratorial scheme or the identities of all of the conspirators" (internal quotations and alterations omitted)).

with Ru and the Undercover, a reasonable juror could have concluded that Pan knew that part of the scheme's success depended on causing the City to issue matching funds on false pretenses. In other words, for his plan to be fully successful, Pan knew that the City would suffer a loss is. That is the very essence of fraudulent intent. *See Guadagna*, 183 F.3d at 129 (fraudulent intent can be inferred from "deceit . . . coupled with a contemplated harm to the victim").

The jury could also have inferred Pan's intent to fraudulently obtain matching funds by comparing his words to his actions. After prompting Ru to explain the matching fund program to the Undercover and then confirming to the Undercover that the scheme involved using straw donors to get matching funds, Pan followed through on the plan by recruiting straw donors whose contributions were eligible to be matched. In point of fact, fully half of the straw donors Pan recruited would have been eligible, as New York City residents, for matching funds. (GX 1311). The jury could have inferred from Pan's words and his actions that obtaining matching funds through straw donations was part of the plan. And that conclusion was only bolstered by the evidence of parallel straw donor schemes operating around the same time as Pan's. The evidence showed that at another event, $40,850—much of which came from straw donors—had the potential of yielding $52,800 in matching funds for the Campaign. (GX 1601). The jury would have been well within its bounds to conclude that these efforts were not remarkable coincidences but were "coordinated activity," the "necessary result" of which was to obtain matching funds from the City under false pretenses. *Panza*, 750 F.2d at 1149, *Guadagna*, 183 F.3d at 130. Under the circumstances, the jury was capable of inferring fraudulent intent beyond a reasonable doubt.

It bears emphasizing that Pan is wrong to suggest that the jury was prohibited from finding intent based on circumstantial evidence. Pan considers it fatal to the Government's case

that he never "bragged to the Undercover about his ability to multiply the amount of the

Undercover's contribution" through matching funds.[3] (Pan Br. 4). But the Government was not

required to come forward with direct evidence of Pan's fraudulent intent, let alone a confession.

As the Second Circuit has recognized, "direct proof of defendant's fraudulent intent is not

necessary. Intent may be proven through circumstantial evidence." *Guadagna*, 183 F.3d at 129.

Here, the evidence established that Pan (i) prompted Ru to explain the importance of matching

funds to the Undercover, (ii) repeatedly confirmed his own understanding of the importance of

matching funds to the scheme, (iii) told the Undercover that they would seek matching funds for

the straw donors' contributions, and (iv) recruited straw donors who, under normal

circumstances, would be eligible for matching funds. The jury was entitled to rely on that

circumstantial proof to conclude that Pan acted with the requisite intent.

Indeed, the Second Circuit has repeatedly held that evidence of this nature is sufficient to

establish fraudulent intent. In *United States* v. *Bifulco*, for example, that Court affirmed a fraud

conviction where the defendant's "specific intent to defraud" an automobile insurer could be

inferred from his "awareness of [an accomplice's] motivation for destroying the Nissan." 127

Fed. Appx. 548, 550 (2d Cir. 2005). In that case, there was no evidence that either of the

defendant's accomplices told him of "their intentions to file a false insurance claim for the

burned vehicle." *Id.* Nevertheless, the jury was permitted to infer the defendant's fraudulent

intent from his knowledge that his accomplice wanted to "destroy[] the Nissan" in order to avoid

"pay[ing] . . . for the excess mileage accrual" on the vehicle. *Id.* That knowledge, coupled with

the fair inference that, as "a fifty-eight year old automobile owner," the defendant would have

---

[3] While Pan did not literally say these words, his comments quoted above about the power of matching funds come
remarkably close. GX 106-T p.5 ("The City, the federal, they never made match a hundred percent. They match it
fifty percent. Let's say he comes up a million. You can get matching funds half millions.").

understood the "financial ramifications" of "the destruction of a leased car," permitted the jury to infer that the defendant knew that "the submission of a false insurance claim for the Nissan's destruction" was the only way of paying for the car. *Id.* at 551. Based on that evidence, the Second Circuit affirmed the jury's finding that the defendant "possessed the requisite specific intent to assist in defrauding the insurer." *Id.*; *see also United States* v. *Singh*, 390 F.3d at 188 (affirming health care fraud conviction where fraudulent intent was established by defendant's falsification of patient notes, instructions to use high billing codes, approval of a subordinate's alteration of a patient's charts, and lack of surprise or confusion post-indictment); *Panza*, 750 F.2d at 1150  ("The jury could reasonably infer that with all of these red flags flying he was conscious that he was playing a part in a fraudulent scheme, even though he may not have known all of the details."). Pan's case falls within the heartland of Second Circuit precedent.

Pan also argues that his "sole purpose [in executing the straw donor scheme] was to obtain a meeting between the Undercover and John Liu." (Pan Br. 4.) But that argument is not inconsistent with the jury's verdict. The jury could have determined that the *means* Pan used to accomplish his purported "sole purpose" was a straw donor scheme to get matching funds, all in an effort to persuade Liu to meet with the Undercover. Pan's fraudulent intent remains firmly established whatever he might claim was his ultimate "purpose." On that point, it is obvious that a single action may reflect multiple purposes. In such cases, the presence of a lawful purpose— even if that purpose is the defendant's predominant or primary purpose—does not undermine the basis for criminal conviction. In this context, the Supreme Court was held that "[a] single conspiracy may have several purposes, but if one of them—whether primary or secondary—be a violation of a federal law, the conspiracy is unlawful under federal law." *Anderson* v. *United States*, 417 U.S. 211, 226 (1974); *see also United States* v. *Biaggi*, 909 F.2d 662, 683 (2d Cir.

1990) ("A valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability."); *United States* v. *Woodward*, 149 F.3d 46, 71 (1st Cir. 1998) ("The criminal law may punish conduct even if its illegal purpose is incidental to other, legal purposes."); *United States* v. *Ellis*, 595 F.2d 154, 162 (3d Cir. 1979) (approving denial of "predominant purpose" jury instruction). Pan's self-serving characterization of his "purpose" in participating in the straw donor scheme is not a sound basis to question the jury's finding of fraudulent intent.

### b.     The Jury Properly Rejected Pan's Entrapment Defense

Pan also challenges his convictions by pressing the same entrapment defense that the jury rejected. (Pan Br. 5-7). In Pan's view, he carried his burden of establishing inducement and the Government failed to show predisposition. (Pan Br. 6). Even assuming that Pan satisfied his burden of showing inducement, when viewed in the light most favorable to the Government, the evidence at trial easily established Pan's predisposition beyond a reasonable doubt. As noted, the Second Circuit has held that predisposition can be proved in any of three ways: by showing "(1) an existing course of criminal conduct similar to the crime for which [the defendant] is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement." *United States* v. *Al-Moayad*, 545 F.3d at 154 (internal quotation marks omitted). Here, the evidence established Pan's predisposition in at least two of these ways.

First, the evidence demonstrated that Pan had engaged in "an existing course of criminal conduct similar to the crime for which [the defendant] [wa]s charged." *Id.* In a recording made by the Undercover, Pan boasted regarding the illegal campaign finance scheme that he had "done

that before." (GX 104; GX 104-T at 6). Pan also explained to the Undercover how he "usually" handled straw donor contributions: he "ha[s] the . . . people . . . fill out the [donation] form, and they either they use their own credit card or check, and then…. And then we give them the cash." (GX 105; GX 105-T at 3). Pan's boasting to the Undercover about his prior uses of straw donors confirmed his predisposition to commit the charged crimes. *See United States* v. *Duran*, 133 F.3d 1324, 1335-36 (10th Cir. 1998) (evidence of predisposition to deal drugs sufficient based, in part, on defendant's "bragg[ing] about being able to obtain drugs" to informant). Rather than viewing this evidence in the light most favorable to the Government, as the Second Circuit requires, Pan views this evidence in the light most favorable to himself, and claims that these statements related solely to the recruitment of straw donors whose donations were not eligible for matching funds. (Pan Br. 6-7).[4] But when every inference is drawn in the Government's favor, the jury was entitled to conclude that Pan's boast about his past conduct, and his explanation about how he "usually" used straw donors, related to Pan's prior efforts to do the same thing Pan was seeking to do for the Undercover, that is, to funnel illegal straw donations into political campaigns, together with the corresponding matching funds.

Second, the evidence demonstrated beyond a reasonable doubt Pan's "willingness to commit the crime[s] for which he [was] charged as evidenced by [his] ready response to the

---

[4] Pan also argues that the evidence was insufficient to demonstrate predisposition because it did not establish that Pan "had engaged in the same crimes charged . . . prior to the Government's first approach." (Pan Br. 6). Not only is this argument inconsistent with the facts set forth above, it is also inconsistent with the law. Contrary to Pan's claim, the Government need not prove that a defendant committed crimes prior to being approached by the Government in order to demonstrate predisposition. Rather, predisposition may be proven entirely by a defendant's ready response to the Government's inducement. *See United States* v. *Al Kassar*, 660 F.3d 108, 115-20 (2d Cir. 2011) (affirming conviction where trial evidence consisted entirely of statements and actions of the defendants after they were approached by Government agents, and rejecting the defendants' claims that they were entrapped, despite the fact that, at least as to defendant al Kassar, the confidential informant took "over several months" to win his trust); *United States* v. *Brand*, 467 F.3d 179, 195 (2d Cir. 2006) (finding, in a child enticement case, that even though a Government agent first broached the topic of the crime in phone calls, the trial court properly relied on the defendant's ready response as evidence of predisposition, including the fact that the defendant "jumped at the opportunity," "planned the logistics" of meeting the agent, and ultimately "traveled to meet [her] at the appointed time and place") (internal quotation marks omitted).

inducement." *Al-Moayad*, 545 F.3d at 154. Pan and the Undercover first discussed straw donors on July 27, 2011, and Pan made clear to the Undercover at this meeting, in a recorded statement, that in Pan's view, the decision about how to proceed with the fundraising event was "all really up to me." (GX103; GX103-A-T at 34). Pan made this statement just after the UC stated, in the recording, that "whatever . . . you [Pan] decide, I'll go with that." (GX103; GX103-A-T at 29). These recorded statements make clear that Pan's decision to commit the crime was "the product of his own preference and not the product of government persuasion." *Williams*, 705 F.2d at 618.

Further, during that same meeting on July 27, 2011, Pan explained the details of the scheme to the Undercover. (GX103; GX 103-A-T at 33-34 ("whenever you want to donate have him [the candidate] come down, you know, we just come up all those name and use different names, but I tell him it's all money from you"), 36 ("we have to make all those names [of the straw donors] . . . have to use their own credit card and cash just behind we give them cash"); 104, 104-T at 4 ("I will have those people [the straw donors] sign the form... uh... use their credit card or check... and then behind uh… you know, uh… cash to them.")). The fact that it was Pan, and not the Undercover, who explained the details of the scheme, and who was familiar with how to execute the scheme, further established Pan's predisposition. *United States* v. *Jackson*, 345 F.3d at 66 (evidence further established predisposition where it demonstrated defendant's "familiarity with the terminology and operations of the drug trade"). In addition, the fact that this evidence was presented in video recordings of Pan also supports the verdict, because "the jury could have concluded from viewing and listening to the recorded transactions that [the defendant] ultimately demonstrated no reluctance or hesitation at all." *Id.* at 67.

Further still, it was Pan, and not the Undercover, who recruited every single one of the straw donors used to funnel the Undercover's illegal contribution to the Liu campaign. (Tr. 307).

13

Among others, Pan recruited and reimbursed Siuling Pun, who in turn recruited and reimbursed straw donors. (Tr. 538-46). Pan's recruitment of Pun and other third parties to the scheme provides additional strong evidence of predisposition. *See Bala*, 236 F.3d at 94 (defendant's introduction of third party to engage in drug sale was evidence of predisposition).

Finally, Pan took a series of other actions that helped the scheme succeed, including taking cash from the Undercover and dividing it up among the straw donors (Tr. 301-04), and coordinating the details of the event with the campaign staff (Tr. 304; GX 156 (text message from Pan to Undercover stating that "Everything's confirmed" for the event)). Then, after the event, Pan reassured the Undercover that Pan had coached the straw donors to lie if anyone asked them questions about the donations. (GX 108). The fact that Pan engaged in this series of actions and transactions provided yet more strong evidence that Pan was predisposed to commit the offense, and belied any claim of reluctance or pressure from the Undercover.

In short, the evidence was overwhelming and effectively uncontradicted that Pan was "ready and willing without persuasion to commit the crime[s] charged and awaiting any propitious opportunity to do so." *Al-Moayad*, 545 F.3d at 154.

## 2.     The Evidence Supported the Jury's Guilty Verdicts as to Hou

### a.     Sufficient Evidence Supported the Jury's Verdict on Count Two

Hou challenges her conviction for attempted wire fraud by arguing principally that the evidence did not establish that Hou took "a 'substantial step' toward the commission of the alleged scheme to defraud." (Hou Br. 10). In making this argument, Hou isolates the evidence of certain acts she took, claiming that such acts were "consistent with her normal legal duties as treasurer of the Liu campaign" (Hou Br. 8), ignores evidence of other acts, and views evidence of each act in isolation, in violation of the Second Circuit's admonition to view pieces of

evidence on a sufficiency challenge "'in conjunction, not in isolation.'" *Persico*, 645 F.3d at 104 (quoting *United States* v. *Eppolito*, 543 F.3d at 45). Contrary to Hou's claims, when viewed in its totality and in the light most favorable to the Government, the evidence was more than sufficient to permit the jury to find Hou guilty of Count Two.

First, the evidence showed that Hou herself offered to reimburse a donor, Thomas Wang, for a contribution. That is, she solicited a straw donor, which was the very means by which the scheme to defraud was accomplished, and which qualifies as a substantial step. (Tr. 477-92; GX301). During the course of this solicitation on July 14, 2011, Hou emailed Wang a contribution card and asked him to sign it, thereby attesting to the New York City Campaign Finance Board ("CFB") that the contribution was from his own funds, even though this would not be true. (Tr. 489; GX 277).

Hou argues that this evidence was insufficient to support her conviction because Wang's donation, even if reimbursed by Hou, "could not have qualified for matching funds" because "Wang was not a New York City resident." (Hou Br. 12).[5] This is the same argument Hou pressed repeatedly at trial, during her opening statement (Tr. 74) and closing argument (Tr. 1793), but that the jury rejected.  And the jury rejected this argument with good reason: it presumes that Hou, having decided to lie to the CFB about the source of the donation, would be honest with the CFB about Wang's New Jersey residence. But the evidence does not support that inference, and in fact supports the opposite inference: that the campaign presented the CFB with

---

[5] Hou also argues that the solicitation of Wang does not qualify as a "substantial step" because it was merely a "preparatory" act. (Hou Br. 14). Contrary to Hou's argument, Hou's solicitation of Wang clearly went beyond "mere preparation." Hou gathered from Wang everything she needed to process a donation – and reimburse him – if the campaign did not meet its fundraising goal later that day.  Then, even after the campaign met the goal, Hou reassured Wang that she would charge him for the donation in the future. The fact that Hou had not yet charged Wang's credit card for the donation and reimbursed him does not change the fact that Hou's actions in gathering from Wang everything necessary for her to process the donation, in the course of emails, chats, and phone conversions, constitutes a substantial step.  It is well-established that a defendant may be convicted of attempt "even where significant steps necessary to carry out the substantive crime are not completed." *Yousef*, 327 F.3d at 134.

false New York City addresses for donors as a matter of course (*see*, *e.g.*, Tr. 745-47, 763-65; GX 502, 503, 509, 511, 512), including for at least one donor whom the evidence demonstrated in fact lived out of state (*see* GX 502 (compare page 1 (New York City address) and 2 (out of state address))).

Hou's argument that she would have been honest with the CFB about Wang's out-of-state residence is also undermined by her conduct in connection with the event on May 9, 2013 ("the May 9 Event"). Hou argues that she "manifested her innocence of any scheme" by telling Yi-Liang ("Alex") Lu, who helped organize that event, in response to an inquiry, that "'people who live outside of New York State can donate as well.'" (Hou Br. 6 (quoting GX 225)). But the evidence showed that the campaign claimed for matching funds *every* single donation from the May 9 Event (*see* GX 1310 (spreadsheet showing all donations and noting those claimed for matching funds), 1312 (W&L donations), 1313 (Superplumbing donations), 1314 (Kang Kang donations), 1601 (summary chart showing that every contributor's donation from W&L, Superplumbing, and Kang Kang was claimed for matching funds)), including for numerous donors for whom a single false New York City address was repeatedly used on the donation forms in the same handwriting (*see*, *e.g.*, Tr. 745-47, 763-65; GX 502, 503, 509, 511, 512). Thus, rather than manifesting Hou's innocence, Hou's email exchange with Lu further demonstrates Hou's guilt, because it tends to show Hou's awareness of the fact that people who lived outside of New York State made donations in connection with the May 9 Event, and yet Hou still claimed every single one of the donations from that event for matching funds, using fraudulent contribution forms.

Hou's argument that her solicitation of a straw donor in July 2011 was not part of a scheme to defraud is further undermined by the testimony of Sharon Lee. On July 12, 2011, just

two days before Hou's own solicitation of a straw donor, Hou and Lee had an online chat conversation in which Lee presented a scenario involving the use of straw donors as a "[s]hady" way to obtain $10,000 in improper campaign contributions. (Tr. 913-14 ("Q: So what makes this shady is if they're straw donors? A. Right"); GX 263).  Around the time of both this conversation on July 12 and Hou's own solicitation of a straw donor on July 14, Lee herself solicited five straw donors. (Tr. 943). Lee did this at a time when she was working around the clock in Hou's apartment, although Lee claimed that she "would step out of the apartment and go for a walk" to make offers to potential straw donors, rather than making the calls from inside the apartment. (Tr. 943). The fact that Hou's solicitation of a straw donor occurred around the same time as the conversation between Hou and Lee relating to straw donors and around the same time and place as Lee's own solicitation of straw donors further supports the jury's conclusion that Hou's solicitation of a straw donor was a substantial step.

Second, Hou concealed from the CFB the identities of the intermediaries who, in connection with the May 9 Event, solicited and reimbursed straw donors, whose donations were all claimed by the campaign for matching funds, and lied to the FBI about this concealment. Hou's efforts to hide the identities of intermediaries is another means by which the scheme to defraud was accomplished, and also qualifies as a substantial step. (*See* Indictment, Count Two at 4 (alleging that Hou "engaged in a scheme to defraud the City . . . by taking steps to conceal the use of Straw Donors")). The evidence established that Hou understood the basic rule that "Intermediaries are individuals . . . who either deliver contributions to a campaign or solicit contributions to a campaign, where such solicitation is known to the campaign." (GX 519). This rule was printed on the "Intermediary Statement" form that Hou provided to intermediaries to sign (GX 519), Hou attended two trainings that covered this rule (Tr. 122, 1287), and Hou's

lawyer explained this rule to her (Tr. 616).  As Hou's lawyer explained to her, if someone delivers contributions from a non-relative to an event, for example, that person is an intermediary for those contributions. (Tr. 616).

The evidence also clearly established that Hou was aware of the roles played by multiple intermediaries – Alex Lu, Meng Hua Wang, and Leon Chen – in connection with the May 9 Event. First, Alex Lu emailed Hou and asked her what to do with donations that he had already collected, and Hou instructed him to bring those donations to the May 9 Event. (Tr. 753-54; GX 505). At the event, Lu delivered the batch of approximately 12 to 15 contributions – including from straw donors – to Hou in an envelope, and Hou thanked him. (Tr. 754-55). In July, Lu again gathered a batch of approximately 15 contributions – again, from straw donors – and Hou picked up the batch in an envelope from Lu's office. (Tr. 765-769; GX 509-516 (donation forms), 522 (text message in which Hou refers to "the batch I picked up yesterday" in reference to the batch of 15 donations)). Thus, Lu performed the very act – delivering contributions to the campaign – that the campaign's lawyer instructed Hou would make someone an intermediary. (Tr. 616). The evidence also established that Hou was aware that Lu's boss, Meng Hua Wang, played a role as an intermediary. Hou emailed Lu two intermediary forms for Wang to fill out and sign, but Wang never did so. (Tr. 830; GX 519). Wang refused to sign these forms with good reason: they required that he affirm that he had not reimbursed donors for any of the donations for which he had served as an intermediary, and that was not true. (Tr. 830 ("I would not dare to sign them")).

In addition to Lu and Wang, the evidence established that Hou was aware that the boss of Superplumbing, Leon Chen, had also agreed to recruit donors for the May 9 event. (*See* GX 237-38 (referring to an "agreement" for W&L to produce 30 donors and Superplumbing to come up

with 50)). Notwithstanding Hou's knowledge of the fact that Lu, Wang, and Chen had all acted as intermediaries, Hou never disclosed these intermediaries to the CFB, and she lied to both the campaign's lawyer, and to the FBI about them. (*See*, *e.g.*, Tr. 1569-1571 (Hou told campaign's lawyer that the campaign had no knowledge of any solicitation with respect to the Superplumbing donations), 850-51 (Hou told FBI that she was aware of no intermediaries other than those already disclosed)). In the light most favorable to the Government, Hou's acts in concealing and lying about these intermediaries – intermediaries who were involved in recruiting and reimbursing straw donors whose donations were claimed for matching funds – were substantial steps in furtherance of the scheme to defraud.

Third, in an online chat, Hou instructed a campaign volunteer, Jorge Fanjul, to forge donor handwriting on contribution cards in order to deceive the CFB into believing that the contribution cards had been filled out solely by the donors themselves, consistent with Hou's training.[6] (Tr. 118; GX 258, 1302-A at 13). This also qualifies as a substantial step, as it amounts to an effort by Hou to avoid CFB scrutiny of contributions, scrutiny that could have led to the discovery of straw donors. Hou provided this instruction notwithstanding the fact that her initial CFB training made clear that only contributors themselves are supposed to fill out contribution cards. (Tr. 118; GX 1302-A at 13). The jury was entitled to conclude that Hou gave this instruction in an effort to avoid CFB scrutiny of contribution cards where an individual other than the contributor – such as an undisclosed intermediary – wrote on the contribution card, and

---

[6] Hou argues that "[t]he government made a strategic decision not to call Fanjul as a witness, hoping to imbue the g-chat with its own interpretation." (Hou Br. 19). But when Fanjul testified as a defense witness, he agreed on cross-examination that the Government's interpretation of the g-chat was correct: after being pressed on cross examination, Fanjul admitted that if he had followed Hou's instructions in the g-chat to imitate a donors' handwriting, that would amount to an effort to deceive the CFB into thinking that only one person had written on each contribution card. (Tr. 1437-38 ("Q: "It's correct that [imitating handwriting on contribution cards] is an effort to deceive someone, right? A. Yes. Q. And the someone that it is an effort to deceive is the Campaign Finance Board, correct? A. Correct.").

thus conceal from the CFB instances where straw donors were used and prevent those contributions and others from being invalidated for matching funds. (Tr. 116-18 (Hou attended CFB training and learned that only contributors should write on contribution cards); DX DCO-5 at 8 (CFB handbook: "Nominee contributions are illegal. Accepting nominee contributions could result in the suspension of all public funds payments and even lead to criminal prosecution.")).

Fourth, Hou assisted in processing the donations from the event on August 17, 2011 organized by Oliver Pan, even though Pan told her, in coded language, that the money was all really from a single source. (*See* GX 107, 107-T at 2 (Pan told Hou it's Richard's event), 107-T at 5 (Pan told Feng it's Richard's event), 107-T at18 (Pan told Liu it's Richard's event), 108, 108-T at 4 (Pan told the Undercover that the candidate "has to know [about the straw donors because ] otherwise it would defeat all the purpose")).[7] After Pan told Hou that the event was Richard's event, Hou sat down with Mr. Pan to review the forms that were supposed to have been provided by Richard's friends. Hou also emailed Pan, and not the Undercover, to follow up on a donation after the event. (GX 292). This evidence, together with all the other evidence, and in the light most favorable to the Government, supports the conclusion that Hou knew that straw donors were being used and took steps to process those donations.

---

[7] Hou argues that the fact that "the jury acquitted Ms. Hou of the conspiracy charge" supports Hou's challenge to the sufficiency of the evidence in support of Count Two (Hou Br. 8), but "a compromise verdict does not of itself warrant reversal." *United States* v. *Ruiz*, 894 F.2d 501, 505 (2d Cir. 1990). Indeed, interpreting criminal verdicts in such a fashion is entirely improper. *See United States* v. *Powell*, 469 U.S. 57, 67 (1984) ("[O]nce the jury has heard the evidence and the case has been submitted, the litigants must accept the jury's collective judgment. Courts have always resisted inquiring into a jury's thought processes . . ."). The Second Circuit could not have been more clear in its rejection of that approach, explaining "[a] court knows only what the jury's verdicts were, not what the jury found, and it is not within the province of the court to attempt to determine the reason or reasons for verdicts that are inconsistent." *United States* v. *Acosta*, 17 F.3d 538, 546 (2d Cir. 1994). This is particularly so where courts have no way of knowing whether a verdict is the result of a "mistake, compromise, or lenity." *United States* v. *Powell*, 469 U.S. at 65; *see also id.* at 66 ("We also reject, as imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them."). Hou's speculation that the jury's verdict was based on a lack of evidence of Hou's knowledge should be rejected.

Each of these pieces of evidence established a substantial step Hou took toward committing a scheme to defraud. When this evidence is viewed in its totality, and in the light most favorable to the Government, the evidence firmly supported the jury's verdict on Count Two. That verdict should not be disturbed.

### b. Sufficient Evidence Supported the Jury's Verdicts on Counts Three and Four

Repeating arguments from her pretrial submissions and jury addresses, Hou contends that she should not have been found guilty of making false statements and obstructing justice. The thrust of her argument is that she cannot be held responsible for making false statements or obstructing justice in connection with a crime she did not commit. (Br. 15, 17). Even assuming the premise, *i.e.*, that Hou did not participate in the straw donor scheme, that fact would not bar her conviction for making false statements or obstructing justice in connection with the investigation. *See, e.g.*, *United States* v. *Stewart*, 433 F.3d 273, 289 (2d Cir. 2006) (affirming false statement and obstruction conviction notwithstanding acquittal of substantive fraud). But the facts do not support Hou's premise, as the jury found her guilty of participating in the straw donor scheme. Accordingly, it was proper for the Government to argue and for the jury to find that Hou withheld documents and made false statements in order to conceal her knowledge of and role in the straw donor scheme.[8]

---

[8] In her brief, Hou argues at length that the Court should have granted her *in limine* motion barring the introduction of her electronic communications with Thomas Wang and Jorge Fanjul. (Hou Br. 18-21). This argument has no relevance whatsoever to a motion challenging the sufficiency of the evidence filed pursuant to Rule 29. *See United States* v. *Jabali*, 105 Fed. Appx. 311, 313 (2d Cir. 2004) ("A Rule 29 motion for acquittal may be granted only on the ground that the evidence against a defendant is insufficient."); *United States* v. *Al Ghazi*, No. S3 07 Cr. 354 (JSR), 2009 U.S. Dist. LEXIS 48474, at *7 (S.D.N.Y. June 5, 2009) ("Rule 29 . . . only authorizes motions challenging the sufficiency of the evidence presented at trial. Defendant's previously rejected arguments thus exceed the proper scope of Rule 29, and his motion is properly denied on that basis alone."). At this stage in the proceedings, Hou's arguments about whether certain evidence should have been in front of the jury are simply irrelevant.

### i.    Count Three: Obstruction of Justice

Hou does not dispute that the Government carried its burden of establishing that she failed to produce documents responsive to the subpoena. (Hou Br. 16). Rather, Hou questions whether sufficient evidence established (i) the "requisite intent" and (ii) that a failure to produce the requested documents would have "impeded the government's investigation." (Hou Br. 16). Sufficient evidence established both elements of the offense.

With respect to Hou's knowledge, the evidence established that Hou concealed dozens of relevant documents from the Government. (GX 1602). The jury could infer from the sheer number of relevant documents that they were not omitted by oversight or accident. *See United States* v. *Brand*, 79 F.2d 605, 606 (2d Cir. 1935) (Hand, *J*.) ("mere coincidence is less probable as their number increases"). In addition, Hou told the FBI and her attorneys that she reviewed her emails one-by-one in order to determine which to produce. (Tr. 851-52, 1003-06; GX413). Based on that testimony, the jury could have inferred that she looked at the concealed emails and chats and then made a conscious decision not to produce them.

The content of the concealed emails and g-chats lent further support to the jury's inference of knowledge.  Hou chose to conceal emails and g-chats containing information that she did not want the Government to know. For example, the following categories of emails and g-chats were not produced to the Government:

> 1.    Hou's g-chats and emails with Thomas Wang about reimbursing him for a donation to the Liu Campaign. (GX 27-78, 283, 288).[9]
>
> 2.    Hou's emails with Alex Lu, in which she tried to have Lu's employer, Meng Hua Wang, sign the intermediary disclosure form. (GX 290-91).

---

[9] Even if these g-chats and emails had an innocent explanation, as Hou contends (Br. 17-18), that does not undermine their facially incriminating nature or eliminate Hou's motive to conceal them for fear that they might be "misconstrued" by the FBI. To the contrary, the fact that Hou chose to conceal them, rather than disclose them and explain their innocent nature, undermines her claim that they were not incriminating. The same reasoning undermines Hou's similar claim about the Fanjul g-chat. (Br. 19).

These e-mails would have shown that Hou knew that Wang was an intermediary who had to be disclosed.

3.    Hou's g-chats and emails with campaign volunteers, including Jorge Fanjul and Crystal Feng, about manipulating the contribution forms to conceal discrepancies, including different handwriting on the forms. (GX 214, 258).

4.    Hou's email to Jeffrey Wu where she discussed reimbursing him for a May 9th fundraising event in an effort to avoid disclosing his role in that event. (GX 294).

5.    An email where Hou expressed concern that Superplumbing (one of the sources of straw donations) would fail to meet its contribution commitment and where she acknowledged knowing that yet another undisclosed intermediary was involved with those contributions. (GX 250).

6.    Emails showing John Liu's direct involvement in fundraising. (GX 210, 212, 272, 273, 275).

The jury could have inferred from the subject matter of the concealed emails that Hou did not want the Government to read them. And that inference would have fully supported the jury's finding that Hou made a knowing and willful decision not to produce the documents.

As for the effect of Hou's obstruction on the Government's investigation, Hou contends that there was none because "the government had already obtained all of her emails and G-chats directly from Google via search warrant." (Hou Br. 16). That argument is as unpersuasive now as it was when Hou presented it to the jury. In fact, this offense element is satisfied so long as Hou "obstruct[ed], influenc[ed], or imped[ed]" the investigation, "*or attempt[ed] to do so*." 18 U.S.C. § 1512(c)(2) (emphasis added). Whether Hou's efforts were successful – or likely to be successful – is immaterial. Even if the Government had all of Hou's emails, that would have meant that it had an unsorted stack of 19,523 emails to review. (Tr. 1236). Hou could very well have been counting on the Government to believe that she had identified all the relevant emails and therefore not undertake the apparently redundant step of reviewing all the emails in her

23

account. Alternatively, she might have taken a chance that any attempt by the FBI to review her emails would be sloppy and therefore omit the emails she sought to conceal.[10] Whatever her reasoning, Hou cannot complain that there was "no rational basis" to conceal the documents. (Br. 17). The jury was entitled to believe that she took a chance in the hope of getting away with it.

### ii.      Count Four: False Statements

Similarly, Hou concedes that she made the statements charged in the Indictment but claims that (i) there was "no rational basis" for her to lie about producing emails, (ii) any such lies would have been immaterial because the FBI already had her emails and g-chats, and (iii) Hou's statements about her knowledge of intermediaries were either correct or based on the advice of counsel. (Hou Br. 17, 21). Hou capably argued all of these points to the jury, but nothing in the record required the jury to adopt Hou's preferred interpretation of the evidence. Rather, the jury was entitled to reject Hou's arguments and conclude instead that Hou lied to the FBI in an effort – perhaps vain or foolhardy – to derail the investigation.

Hou's argument that there was no reason for her to lie about producing emails and g-chats fares no better here than it did with respect to the obstruction of justice count. Hou is hardly the first suspect to lie during an FBI interview, and the fact that Hou should have "known better" and was advised by counsel not to lie is also not without precedent. *See, e.g.*, *Stewart*, 433 F.3d at 285 (noting that defendant consulted with lawyer prior to FBI interview during which she lied). There is simply nothing in the record that compelled the jury to adopt Hou's characterization of her motives and incentives.

The record is equally inhospitable to Hou's claim that her false statements were immaterial. (Br. 17). Under Second Circuit precedent, "[a] false statement is material if it tends

---

[10] On this point, Hou did indeed argue at trial, albeit unpersuasively, that the FBI agents performed a sloppy review of her account in which they failed to seize relevant documents. (Tr. 1809-10).

to or is capable of influencing the decision-making body to which it was addressed[, including by] distracting government investigators' attention away from [an area of investigation]." *Stewart*, 433 F.3d at 318. Here, Special Agent Chu testified, without contradiction, that he and his fellow agents were "looking to interview and find out more information" about intermediaries for the Liu Campaign. (Tr. 81). It was material for the FBI to know whether the Liu Campaign had honestly disclosed all its intermediaries or whether there were additional, undisclosed intermediaries out there. Knowing the answer to that question would have helped the FBI identify and interview intermediaries and possibly identify additional straw donors. Hou's false statement, if believed, was capable of distracting the agents from their search for undisclosed intermediaries.

It was equally material for the FBI to know whether Ms. Hou had reviewed all of her emails and disclosed all those that were responsive. As Agent Chu testified, the "email correspondence between contributors, intermediaries, and members of the campaign . . . assisted [the agents] in identifying other intermediaries and the activities of those intermediaries." (Tr. 852-53). Hou's false statement was material because, if credited, the agents might have foregone an exhaustive review of the 19,253 emails in Hou's account and thereby missed incriminating documents. Instead, because the agents suspected she was lying, they "rereview[ed] and rescrutinize[d] that e-mail account." (Tr. 875). Again, her statement was capable of "distracting government investigators' attention" and therefore material. *Stewart*, 433 F.3d at 318.

The evidence equally supported the jury's finding that Hou's statements about disclosing known intermediaries were knowingly and willfully false. The evidence established that the Liu Campaign carefully tracked its intermediaries and that Hou played a central role in tracking, monitoring, and coordinating with the intermediaries. (Tr. 865-96). Hou created and maintained

several spreadsheets keeping track of the hosts and intermediaries, and she measured the progress they were making toward their fundraising goals. (GX 213, 270, 273).

The evidence also established that Hou interacted directly with intermediaries whom she never disclosed to the CFB. In one email, Hou contacted Alex Lu about the W&L and Superplumbing "agreement" to deliver 30 and 50 donors, respectively, to the Liu Campaign. (GX 237-38). In other emails, Hou thanked Lu for "*gathering*" contributions, and Lu told her about contributions he had already *collected* – the quintessential role of an intermediary or so-called "bundler." (GX 230, 254, 505). Lu also emailed Hou a file entitled "forms collected." (GX 232). In another email, Hou expressed concern that Superplumbing would fail to honor its donor commitment. (GX 250). In fact, Hou wrote that she called Danny at Superplumbing "every Friday," because he postponed pickup of the donations three weeks in a row.  (GX 250). These emails established that Hou knew people at W&L and Superplumbing were soliciting donors in order to fulfill that agreement. They established that she knew there were intermediaries involved with those donations.

In the clearest example that Hou knew an intermediary needed to be disclosed in connection with the W&L contributions, she sent Lu an email asking him to have Meng Hua Wang, the W&L president, fill out an intermediary form.  (GX 290).  When she received no response, Hou reminded Lu about the form, expressing thanks for all Wang had done for the Liu Campaign. (GX 291). A jury could infer that Hou sent Wang the intermediary form because she knew he was an intermediary who needed to be disclosed. Wang was nevertheless not disclosed as an intermediary. (GX 1601).

While Hou relies on her attorney's instructions to disprove her knowledge and intent (Hou Br. 21), her interactions with counsel actually support the jury's guilty verdict. Indeed, the

evidence showed that Hou lied to the campaign's attorney, Martin Connor, in order to avoid

having to disclose intermediaries who reimbursed straw donors.  Connor testified that anyone

who "delivers contributions [to an event] from someone else who is not their sibling, child

grandparent, parent, domestic partner . . . would be an intermediary for that contribution."  (Tr.

616). Connor also testified that, if campaign staff knew about an individual who collected and

delivered contributions from non-relatives to the campaign after a fund-raising event, that person

would be an intermediary. (Tr. 624, 627). Accordingly, had Hou disclosed all of her knowledge

about the intermediaries from W&L and Superplumbing, Connor would have told her to disclose

them as intermediaries. Hou's withholding of that information from Connor simply underscored

the willfulness of her lying to the FBI.

## CONCLUSION

The defendants' motions should be denied.


Dated:  New York, New York
        June 7, 2013

                                Respectfully submitted,

                                PREET BHARARA
                                United States Attorney


By:     _____/s_____
             BRIAN A. JACOBS
             JUSTIN ANDERSON
             Assistant United States Attorneys
             (212) 637-2512/1035


cc:     All counsel (By email and ECF)